## THURBER v. COMMISSIONER OF INTERNAL REVENUE.
### No. 3093.

Circuit Court of Appeals, First Circuit.
July 14, 1936.

J. Robert Sherrod, of Washington, D. C. (O. H. Chmillon and Miller & Chevalier, all of Washington, D. C., on the brief), for petitioner for review.

Morton K. Rothschild, Sp. Asst. to Atty. Gen. (Robert H. Jackson, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for the Commissioner.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

MORTON, Circuit Judge.

This case involves personal income taxes assessed for the year 1930 under the Revenue Act of 1928 (45 Stat. 791).

The first point in controversy is whether the combination of the old Guaranty Savings Bank of Nashua, N. H., with the

816

Second National Bank of that city, was "a merger or consolidation" within the meaning of section 112 of the act referred to (26 U.S.C.A. § 112 and note), so that no taxable gain or loss arose from the exchange of shares. The Commissioner held that the combination was not a merger or consolidation, but was a *sale* of the assets of the Savings Bank to the National Bank. He accordingly imposed a tax on the gain accruing to the stockholders in the Savings Bank from the exchange of shares. His action was affirmed by the Board of Tax Appeals, four members dissenting; and the taxpayer has appealed.

The banks in question were independent institutions which had been in business many years. In the fall of 1929 committees appointed by each agreed in recommending to the stockholders a merger of the two institutions. The National Bank had at that time capital stock of $150,000. The plan of merger as outlined by the committees was that the National Bank should continue in business, should double its capital stock by the issue of 1,500 new shares for distribution to the stockholders of the Savings Bank, and should take over the business, good will, assets, deposits, and liabilities of the Savings Bank; that the Savings Bank should reduce its assets before merging by distributing to its shareholders by way of a special dividend certain shares of stock which it owned in the Pullman Company and the Nashua Manufacturing Company and also $1.33 per share in cash representing the accrued dividend at the usual rate on its shares to the date when the combination became effective; that *all* the stock of the Savings Bank should be turned over to the National Bank and be paid for by it at the rate of three shares of its own stock for four shares of the Savings Bank's stock; that the National Bank on taking over the assets of the Savings Bank should assume all the latter's liabilities; and that the Savings Bank should thereupon be dissolved.

Before this plan was voted upon by the stockholders it was discovered that the law required new stock of a National Bank to be paid for in cash. The plan was therefore modified so that the National Bank on receiving transfers of all the stock of the Savings Bank should give to the trustees, who acted for the stockholders in the Savings Bank and by whom the shares were actually surrendered, its cashier's check for the agreed price of the shares, viz., $467,947.74, and that the recipients of the check should immediately endorse it back to the National Bank in return for 1500 shares of the capital stock of the National Bank which they would distribute to the former stockholders of the Savings Bank, in the ratio stated. The plan as modified was duly approved by the stockholders in both institutions, and was carried out. All the assets of the Savings Bank, including real estate, cash, securities, etc., were transferred to the National Bank; and the National Bank duly assumed all the liabilities of the Savings Bank to its depositors and all other persons, and took over its business.

In the formal notices to and votes of the stockholders the transaction is referred to as a "sale" of the assets of the Savings Bank to the National Bank. But in a letter accompanying the formal notices it was said that the meeting was called "for the purpose of authorizing and approving the *consolidation* of this bank with the Second National Bank"; and the expression *"consolidated bank"* is used, referring to the continuing institution. (Italics supplied.) In another letter to the stockholders in which the transaction was also referred to as a *sale,* it was said to be, "in connection with the *proposed consolidation* of this bank with the Second National Bank." (Italics supplied.) In letters accompanying the formal notices to the stockholders of the National Bank the same idea is repeatedly expressed, viz., that the transaction was a *"consolidation"* of the two banks.

The Comptroller of the Currency appears to have been fully informed about the whole transaction and it was arranged and carried out with his knowledge and approval. There is no controversy about the facts. They are covered by stipulation and by undisputed testimony. That there was a definite plan by all parties in interest to merge or consolidate the two banks, and that the plan was in substance carried out, seems to us too clear for further discussion.

The government contends that the decision by the Board of Tax Appeals that the combination of the two banks was not a merger or consolidation, but a sale, was a finding of fact and therefore is not reviewable. But as all the material facts are agreed to or are undisputed, the legal effect of them, whether sale or merger, is a

question of law, or a mixed question of law and fact, on which the decision by the Board is subject to review. Helvering v. Rankin, 295 U.S. 123, at page 131, 55 S.Ct. 732, 79 L.Ed. 1343. See, too, Starr v. Commissioner (C.C.A.4) 82 F.(2d) 964, April 6, 1936; General Utilities Co. v. Helvering, 296 U.S. 200, at page 207, 56 S.Ct. 185, 80 L.Ed. 154. The government also contends that there was no merger or consolidation because *all* the assets of the Savings Bank were not transferred to the National Bank, as required by the statutes;* and the Board of Tax Appeals so found and ruled.

The Board of Tax Appeals said:

"If a given transaction in strictness can be designated as either a merger or a consolidation, it is a reorganization within the meaning of the definition, and the words in parenthesis are unimportant. If, however, a particular transaction, which in strictness cannot be designated as either a merger or consolidation, nevertheless partakes of the nature of a merger or consolidation, it must be tested by the words in the parenthesis to see whether or not it is a reorganization within the meaning of the statute."

"The National Bank did not acquire 'substantially all the properties' of the State Bank."

"Since the National Bank did not acquire substantially all of the properties of the State Bank, the transaction was not a 'reorganization' within the meaning of the parenthetical part of the definition. The case of Howard v. Commissioner (C.C.A.) 56 F.(2d) 781, affirming 20 B.T.A. 207, is not in point, since in that case substantially all the properties were acquired."

"However, the fact that the National Bank did not acquire substantially all of the properties of the State Bank would be immaterial if the transaction was one which in strictness could be designated as either a merger or a consolidation."

---

*Revenue Act of 1928, c. 852, 45 Stat. 791:

"§ 112. Recognition of gain or loss

"(a) General rule. Upon the sale or exchange of property the entire amount of the gain or loss determined under section 111, shall be recognized, except as hereinafter provided in this section.

"(b) Exchanges solely in kind— * *

"(3) Stock for Stock on Reorganization.

"No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. * * *

"(c) Gain from exchanges not solely in kind—

"(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

"(2) If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property. * * *

"(i) Definition of Reorganization. As used in this section and sections 113 and 115—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)." 26 U.S.C.A. § 112 and note.

"§ 115. Distributions by Corporations— * * *

"(c) Distributions in liquidation.

"Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112." 26 U.S.C.A. § 115 note.

The assets, the omission of which was held by the Board of Tax Appeals to have prevented a merger, are the shares in the Pullman Company and the Nashua Manufacturing Company and the $1.33 accrued dividend. The special dividend by which these were distributed was voted on May 20, 1930. The combination of the banks became effective on June 2, 1930. This objection to the merger view seems to us entirely unfounded. We do not doubt that the assets of a corporation which is to be merged may, by agreement of the persons concerned, be reduced by distribution to its stockholders before the merger takes place, so that the stock at the time when the merger is consummated will have the value which the merger contemplates. There is an explicit finding that this was the purpose of the special dividend just referred to. The statute means that all free assets of the corporation at the time of the actual merger shall be transferred to the new corporation; and this was done in the present case. The Board erred in its understanding of the statute. The case comes within it.

The Board of Tax Appeals in reaching its conclusion that "in strictness" (as it says) there was no merger disregarded the obvious understanding of the parties that a merger or consolidation was being effected and did not consider the transaction as a whole. In effect the Board picked out a single step in a transaction involving a series of steps and, without looking at anything else, held that the entire transaction was a sale. This method of dealing with the question was inconsistent with previous decisions by the Board and by the courts and seems to us to be clearly wrong. Prairie Oil & Gas Co. v. Motter, 66 F.(2d) 309, 311 (C.C.A.10); Howard v. Commissioner (C.C.A.) 56 F.(2d) 781; George Woodward v. Commissioner, 23 B.T.A. 1259. The transaction should have been viewed as a whole, as the Commissioner himself had insisted and the Board of Tax Appeals had held in the Howard Case. Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284. In Irving v. United States, 44 F.(2d) 246 (Ct.Cl.) the court looked through an issue and exchange of checks very similar to what took place here and held that the transaction constituted "a stock dividend" for purposes of tax liability. The characteristics of mergers or consolidations are clearly stated in Cortland Specialty Co. v. Commissioner (C.C.A.) 60 F.(2d) 937 (referred to and approved in Pinellas Ice Co. v. Commissioner, 287 U.S. 462, at page 470, 53 S. Ct. 257, 77 L.Ed. 428) and need not be repeated. The test is whether there was "some continuity of interest on the part of the transferor corporation or its stockholders." A. N. Hand, J., 60 F.(2d) 937, 940. Whether "the seller acquired a definite and substantial interest in the purchaser." McReynolds, J., Helvering v. Minnesota Tea Co., 296 U.S. 378, at page 386, 56 S.Ct. 269, 272, 80 L.Ed. 284. See, too, Sage v. Commissioner (C.C.A.2) 83 F.(2d) 221, April 6, 1936.

The present case is precisely within these statements. The upshot of what was done was that the National Bank took over the business assets and liabilities of the Savings Bank together with all its capital stock and paid for them with 1,500 shares of its own new stock which was distributed to the former stockholders in the Savings Bank, and gave them a 50 per cent. interest in the National Bank. The stockholders in the dissolved corporation became owners of one-half the stock in the consolidated company continuing the business. If this was not a merger or consolidation "in strictness," it is not easy to imagine what would be one. For purposes of taxation mergers meeting the requirements of the revenue acts will be recognized as such whether they are made under the provisions of the banking law, or not. Pinellas Ice Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428.

As to the taxability of the special dividend of Pullman Company and Nashua Manufacturing Company and $1.33 in cash: This dividend was declared in connection with the merger as a liquidation pro tanto of the assets of the Savings Bank and it should be taxed on that basis.

The decision of the Board of Tax Appeals is vacated, and the case is remanded to the Board for further proceedings not inconsistent with this opinion.

WILSON, Circuit Judge (dissenting).

I dissent from the majority opinion in this case. The two banks, it is true, started out with a plan which might have complied with the definition of a reorganization under section 112 (i) (1) (A) (all references are to the 1928 Act), but which, by reason of the federal statutes requiring a new issue of capital stock of a national bank to be paid for in cash, was changed to a sale and purchase of a part of the as-

sets of a state bank without acquiring its capital stock.

Under the new plan the same partial liquidation of the assets of the Savings Bank was had; but, instead of an exchange of capital stock, the National Bank purchased the remaining assets of the Savings Bank for the sum of $467,947.74, which was paid to a committee or trustees selected by the stockholders of the Savings Bank for the purpose, and the trustees immediately indorsed the check of the cashier of the National Bank over to the National Bank in payment for 1,500 shares of its capital stock authorized by the National Bank for the purpose of acquiring the assets of the Savings Bank.

The opinion of the majority holds that there was an exchange of the stock of the Savings Bank for the stock of the National Bank in accordance with the original plan; that the sale of assets and purchase of stock was a matter of form. The burden is on the petitioner to prove that the National Bank acquired control of the capital stock of the Savings Bank in order to comply with the definition of a reorganization under section 112 (i) (1) (A). Clearly there was no reorganization under B of that paragraph, since the Savings Bank, having been dissolved, did not, after the transfer, control the National Bank.

I find no evidence, or finding by the Board of Tax Appeals, that under the revised plan the National Bank acquired the capital stock of the Savings Bank and the control of that institution. By the new plan it acquired for cash all the assets of the Savings Bank except certain stocks and cash, and therefore had no occasion to acquire its capital stock. A sale of the assets of the Savings Bank for cash and the purchase of the capital stock of the National Bank was necessary to comply with the federal statutes. It does not now lie in the mouths of the trustees of the Savings Bank, in order to escape income taxes, to say that this was in effect, an exchange of stock of the Savings Bank for the stock of the other bank, which was prohibited by law. The only mention in the record of an exchange of Savings Bank stock for that of the National Bank is in a vote of the stockholders of the Savings Bank at a meeting held on March 3, 1930, in which it was voted that two trustees be elected with authority to receive the stock of the Savings Bank and exchange it for 1,500 shares of the National Bank. The call for this meeting was issued February 13, 1930.

Undoubtedly some time prior to March 24, 1930, the banks learned that the issuance of the National Bank stock could only be for cash, or the National Bank officials were aware of the law on this point, as in the vote of the stockholders of the National Bank at a meeting held on March 24, 1930, to complete the transfer, there was no mention of an exchange of National Bank stock for the stock of the Savings Bank. The vote was to purchase the assets of the Savings Bank and to sell the newly issued stock of the National Bank. There never was any vote by the directors or stockholders of the National Bank to exchange its stock for that of the Savings Bank. It is the method of merger or consolidation, if there be one, and not the result intended which determines whether a tax results under sections 111 and 112, Revenue Act 1928 (26 U.S.C.A. §§ 111 and note, 112 and note).

On April 5, 1930, the trustees of the Savings Bank voted to contract to sell its assets to the National Bank in accordance with a certain "contract of sale" which was presented and read at the meeting. It is significant, I think, that there is no mention in this "contract of sale" of any transfer or exchange of Savings Bank stock for National Bank stock; nor is there any mention in the meetings of the stockholders of the Savings Bank of an exchange of stocks between the two banks after the meeting of March 4, 1930. Excepting as above mentioned, the records of both corporations are silent as to an exchange of stock and refer only to a sale of the assets of the Savings Bank and a purchase of the 1,500 shares of the stock of the National Bank with the purchase price of the Savings Bank's assets.

The sale was completed in accordance with the contract authorized on April 4. The National Bank stock was transferred to the two trustees authorized to make the transfer of the assets of the Savings Bank, who afterward upon the deposit of the stock of the Savings Bank with them, distributed to the stockholders of the Savings Bank stock of the National Bank in the proportion of three shares of National Bank stock for four shares of Savings Bank stock, which was the relative value of the two stocks agreed upon by a committee of the two banks.

Such, in substance, were the findings of the majority of the members of the Board of Tax Appeals and also of the minority members of the Board.

The testimony of the members of the trustees of the Savings Bank is to the same effect, viz.: that the 1,500 shares of capital stock of the National Bank was conveyed to the trustees named by the Savings Bank to receive them for the Savings Bank and who later exchanged them with the stockholders of the Savings Bank as they deposited their shares of the Savings Bank with said trustees. Proof is lacking of any transfer of Savings Bank stock to the National Bank under the contract of sale; nor does the contract provide for such a transfer.

A sale of assets does not constitute a reorganization within the language of section 112 (i) (1) (A). Pinellas Ice Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428.

A merger or consolidation or reorganization is a statutory concept. Upon the record in the case the National Bank, by this transaction, did not acquire a majority of the voting stock of the Savings Bank or any portion of it; nor was there a reorganization under section 112 (i) (1) (B) whereby the transferor (the Savings Bank), after the transfer of its assets, was in control of the corporation to which its assets were transferred.

The only question here bearing on the issue of a merger of these banks is whether the National Bank acquired substantially all the property of the Savings Bank; whether the acquiring of the assets of the Savings Bank back of the deposits, for which the Savings Bank was liable, can be considered in determining whether the National Bank by the sale for which it paid only $497,000, which represented the amount of capital stock of the Savings Bank, its surplus account and undivided profits on June 2, 1930, can be said to have acquired nearly $4,000,000 of assets, which were held in trust by the Savings Bank to secure its depositors. It may be doubtful whether the National Bank, within the meaning of section 112 (i) (1) (A), acquired these accounts or assets held in trust for the security of the deposits until the accounts were later transferred to the National Bank by the depositors in the Savings Bank.

The Board of Tax Appeals found that the National Bank did not acquire by the sale substantially all the property of the Savings Bank, since there was reserved for distribution to the stockholders 1,000 shares of Pullman stock, 1,000 shares of the preferred stock of the Nashua Manufacturing Company, and a certain amount of cash, which were distributed ratably among the stockholders of the Savings Bank.

But assuming that the National Bank by this sale acquired substantially all the property of the Savings Bank and a reorganization was effected under section 112 (i) (1) (A) by what was done under the plan finally agreed to, gain or loss might still result which would be taxable, or deductible, if the transaction did not fall within one of the five subparagraphs of 112 (b). Rose v. Trust Co. of Georgia (C. C.A.) 77 F.(2d) 355. Each of these subparagraphs relates to the exchange of properties, not to a sale. Cortland Specialty Co. v. Commissioner (C.C.A.) 60 F.(2d) 937, 940. Unless the exemptions of gain or loss provided by Congress in section 112 (b) are present, even though a reorganization resulted within the meaning of section 112 (i) (1), an income tax results whatever may have been the intent of the parties. Sections 111, 112 (a).

While in certain cases substance rather than form governs in computing income taxes, the courts have often said: "Income-tax liability must be determined by what actually takes place, rather than by what might have taken place." Hoult v. Commissioner, 24 B.T.A. 79; Clemmons v. Commissioner (C.C.A.) 54 F.(2d) 209, 211; Weiss, Collector of Internal Revenue v. Stearn, 265 U.S. 242, 254, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A.L.R. 520. The rule that substance, not form, determines the tax, does not apply where the alleged substance of the transaction on which the tax is based is prohibited by law. Income taxes may be avoided by a lawful transaction, Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355; but a taxpayer cannot avoid a tax by a subterfuge, especially if unlawful, either in form or substance.

The original intent to make an exchange of stock with the Savings Bank for capital stock of the National Bank was prohibited. The merger of these banks, therefore, could only be effected by a sale of the assets of the Savings Bank. It is what is actually done, not what the parties intended to be done, which determines lia-

bility for income taxes. Both in form and in substance the transaction in this instance constituted a sale of the assets of the Savings Bank. If it resulted in a liability for an income tax, the result must be accepted.

I think the decision of the Board of Tax Appeals should be affirmed.